# EXHIBIT 1

# ADMINISTRATIVE SERVICES CONTRACT

## MONTHLY WIRE PROGRAM

### BETWEEN

### BLUE CROSS BLUE SHIELD OF MICHIGAN

### AND

### IRONWORKERS LOCAL 340 FUND

# Table of Contents

Recitals

Article I - Definitions

Article II - General Responsibilities

    A.    Standards
    B.    Services to be Performed by BCBSM
    C.    Enrollment
    D.    Claims
    E.    Dispute Resolution
    F.    Fund Audits
    G.    Disclosure
    H.    Statutory and Contractual Interest
    I.    Confidentiality
    J.    Medicare Secondary Payer
    K.    Appeal Procedure
    L.    Certification of Creditable Coverage

Article III - Financial Responsibilities

    A.    General Obligations - Hold Harmless
    B.    Specific Obligations
    C.    Personal Liability of Trustees

Article IV - Payment of Financial Responsibilities

    A. Timely Payment and Remedies
    B. Scheduled Payments
    C. Quarterly Settlements
    D. Changes in Enrollment or Coverage
    E. Hospital Settlement Adjustments
    F. Post Termination
    G. Conversion to Underwritten Fund

Article V - Fund Acknowledgement of BCBSM
            Service Mark Licensee Status

Article VI - Blue Card Program Services Processed and Paid by Other BCBS Plans

    A. Application
    B. Access Fees
    C. Payment of Access Fees
    D. Enrollee Copayments
    E. Small Claims Applied to Deductibles and/or Copayments


Article VII - Agreement, Term, Termination, Amendment, Performance and Validity of Law

    A. Entire Agreement
    B. Termination
    C. Performance
    D. Validity
    E. Law and Jurisdiction
    F. Miscellaneous Provisions
    G. Notice
    H. Authority of Trustees to Execute Contract
    I. Transition of Administrative Services

# ADMINISTRATIVE SERVICES CONTRACT (ASC) - MONTHLY WIRE PROGRAM

THIS CONTRACT, July 1, 2000, between Blue Cross and Blue Shield of Michigan (BCBSM), a Michigan non-profit Corporation, whose address is 600 East Lafayette, Detroit, Michigan 48226, and (Ironworkers Local 340) Fund, whose address is 510 E. Columbia, Lansing, MI 49015.

## RECITALS

The Fund was established for the purpose of providing health care benefits to its participants and beneficiaries from contributions received from Employers who are signatories to collective bargaining agreements (hereinafter "Employers") with the Ironworkers Local 340 Fund (hereinafter "Fund").

BCBSM has been selected to perform some administrative services in connection with this health care benefit program offered by the Fund.

The intent of this Contract is to:

1. Define the contractual relationship between BCBSM and the Fund;

2. Establish the criteria for eligibility of individuals for health care coverage(s) provided by the Fund;

3. To describe the health care coverage(s) available to such individuals through the Fund;

4. To set forth the general administrative responsibilities of BCBSM and the Fund;

5. To set forth the financial responsibilities of the Fund for health care coverage(s) administered by BCBSM under this contract; and

6. To provide for the administration of the Fund's health care plan as a self-funded plan pursuant to the Employee Retirement Security Act of 1974 (ERISA) and to not do any act which would jeopardize the plan's benefit of any pre-emption from state law under ERISA.

THEREFORE, in consideration of their mutual promises, BCBSM and the Fund agree as follows:

# ARTICLE I
## DEFINITIONS

For purposes of this Contract, defined terms are:

A.　**"Amounts Billed"** means the amount the Fund owes in accordance with BCBSM's standard operating procedures for payment of Enrollees' claims.

B.　**"Contract"** means this Contract, as may be amended from time to time, and any Schedules, Exhibits and Addenda attached hereto.

C.　**"Contract Year"** means the Initial Term of this Contract and each Renewal Term. In the event of termination other than at completion of the Contract Year, a Contract Year means that period from the Effective Date or the most recent Renewal Date through the termination date.

D.　**"Coverage(s)"** means the health care benefits selected by the Fund listed on Part C - Coverage Selection.

E.　Disputed **Claim(s)"** means Amounts Billed used to determine the Fund's liability which the fund believes should not be so used.

F.　**"Effective Date"** means July 1, 2000.

G.　**"Enrollees"** mean Participants and dependents of Participants who are eligible and enrolled for Coverage.

H.　**"Estimated Outstanding Liability (EOL)"** means an estimate of the Fund's liability for the amount of Incurred But Not Reported Claims (IBNR) which will be paid by BCBSM after the date of termination, and which is the Fund's obligation to pay pursuant to the provisions of this Contract.

I.　**"IBNR Claims"** means Enrollees' claims which are incurred pursuant to this Contract but have not been reported as paid to the Fund and for which Amounts Billed will remain the Fund's responsibility pursuant to this Contract.

J.　**"Initial Term"** means the first Contract Year commencing on the Effective Date.

K.　**"Participants"** mean the following who are eligible and enrolled for Coverage: (i) members as designated by the Fund in Schedule B – Group Information; (ii) if applicable, retirees or their surviving spouses as designated by the Fund in the Retiree Agreement; and (iii) COBRA beneficiaries .

L.　**"Provider Network Fee"** means the amount allocated to the Fund for the expenses incurred by BCBSM in the establishment, management and maintenance of its participating hospital, physician and other health care provider networks.

M.  **"Quarterly Payment Period"** means each three (3) month period, commencing on the Effective Date and continuing during the Term(s) of this Contract and, for purposes of Article IV.F. only, also includes the first three (3) months following termination.

N.  **"Renewal Date"** means the first day of each Renewal Term stated in Schedule A.

O.  **"Renewal Term"** means a period commencing on the first day following the end of the Initial Term and of each subsequent Contract Year as stated in Schedule A.

P.  **"Term(s) of this Contract"** means the period(s) beginning with the Effective Date and continuing thereafter until terminated as provided in Article VII.

# ARTICLE II
# GENERAL RESPONSIBILITIES

A.  **Standards.**

BCBSM shall administer Enrollees' health care Coverage(s) in accordance with BCBSM's standard operating procedures for comparable coverage(s) offered under a BCBSM underwritten program, any operating manual provided to the Fund, and this Contract. In the event of any conflict between this Contract and such standard operating procedures or operating manual, this Contract controls.

B.  **Services To Be Performed By BCBSM.**

BCBSM shall, for the compensation stated in Article IV, provide the following services to the Fund:

1.  The production and distribution of BCBSM ID cards to Participants.

2.  Personalized service through a specifically designed account representative who will personally service the Fund, and a dedicated customer service representative who will be responsible for the Fund's participants.

3.  Automated claims processing. In addition, BCBSM will act on health care claims within fourteen (14) days of receipt of a claim, unless special or unusual circumstances exist.

4.   Comprehensive financial management, reports and monthly claims reports, and annual medical utilization reports. BCBSM will, in addition, review the annual utilization report with the Trustees.

5.   The price advantages of participating provider agreements with hospitals, physicians, and professional providers.

6.   Actuarial services that provide Trustees with claim projections, illustrative rates, reserve requirement reports, claim reports and benefit utilization reports, including the Experience Analysis Mechanism (EXAM) which will provide the Trustees with a breakdown of benefit usage.

7.   A toll free or .800. telephone number for participants and employees who have inquiries regarding their benefits.

8.   Cost containment initiatives, including individual case management programs, inpatient precertification, utilization review, coordination of benefits (COB), second surgical opinion and ambulatory surgery.

9.   Provider utilization audits to ensure that Fund benefits are delivered in the intended manner and billed as rendered.

10.  Automated "on-line" access for enrolling, eligibility updating and reporting. BCBSM will train employees of the Fund or the Fund agent to operate the on-line access to BCBSM

11.  Attend and participate, at the Trustees' request, in Trustee meetings.

12.  Maintain all records necessary, and at the request of the Fund's auditors, provide such reports necessary to permit the Fund to prepare any reports to conduct any audits as shall be required by the ERISA which records and reports will be maintained and prepared in accordance with generally acceptable accounting principles and generally acceptable auditing standards. Any such audits will not be conducted more than required by ERISA and shall not include claims included in prior audits and shall be conducted pursuant to reasonable BCBSM Corporate Policy. To permit the Fund's auditors to certify the annual statements to the Fund, BCBSM will provide the records necessary for the preparation of all necessary annual reports, including tax exemption returns, tax returns, and state and federal reports. The confidentiality, indemnification and prior agreement provisions of Section F of this Article will apply to any audit under this subsection.

13.   Provide the Fund assistance in communicating with its Participants regarding the benefits available and the application process and, at the reasonable request of the Trustees, BCBSM shall set up and conduct educational seminars to inform Participants of their benefits and respond to questions.

14.   In accordance with BCBSM standard operating procedures, employ provider representatives who will act on behalf of the Fund of participants to secure provider participation and assist provider concerns.

15.   An anti-fraud and financial investigation service which will work with the Fund to help ensure that Fund monies are not spent improperly as a result of fraudulent conduct by providers.

Notwithstanding anything contained in this Contract to the contrary, BCBSM is not the Plan Administrator, Plan Sponsor, or a named fiduciary for the purposes of the Employee Retirement Income Security Act of 19 74 (ERISA) and its obligations shall be limited to the processing and payment of Enrollees' claims as provided herein; however, nothing in this Contract shall be construed to relieve BCBSM of any other responsibilities it may have to the Fund under ERISA.

**C.   Enrollment.**

The Fund will, prior to the Effective Date of this Contract, notify BCBSM of all Enrollees eligible and enrolled for Coverage and will, thereafter, promptly notify BCBSM of all changes in eligibility/enrollment according to procedures established by BCBSM. BCBSM will not have any obligation as to changes in eligibility/enrollment prior to proper notification.   BCBSM will continue to process and the Fund will continue to reimburse BCBSM for claims of Enrollees which were incurred through the last day of the month in which BCBSM had at least five (5) business days notice of Enrollee ineligibility.

However, if Fund employs an automated means, acceptable to BCBSM, for providing enrollment and eligibility information to BCBSM, the changes will be effective on the first day following the day such changes have been properly reflected on the data base used by BCBSM to process Enrollees' claims.

**D.   Claims.**

BCBSM will process and pay, and the Fund will reimburse BCBSM for all Amounts Billed related to Enrollees' claims incurred during the Term(s) of this Contract.

Following termination of Enrollee eligibility, or following termination of this Contract, as set forth in Article VII.B.1., BCBSM will continue to process and pay Enrollees' claims which are incurred during the Term(s) of this Contract; and following termination for Nonpayment or Partial Payment, as set forth in Article VII.B.2., or in the event of Enrollee ineligibility, BCBSM may, in its discretion, continue to process and appropriately pay IBNR claims and the Fund will reimburse BCBSM for any claims so paid.

Notwithstanding any other Contract provisions, BCBSM will have no obligation whatsoever as to claims which are incurred following termination of this Contract.

**E.   Dispute Resolution.**

The Fund will, within sixty (60) days of receipt of a claims listing, notify BCBSM in writing with appropriate documentation of any Disputed Claim(s) and will, upon request, execute any documents required for collection of amounts that third parties owe.  BCBSM will investigate and within a reasonable time, respond to such Claim(s).  Additionally, BCBSM will,

(1)     following the recovery of an amount from a third party, due to Worker's Compensation or other provider/program/party responsibility or

(2)     following BCBSM's determination that any other disputed amount is not the Fund's liability or that an amount shown on a claims listing and invoice is incorrect,

credit the recovered or corrected amount, reduced by any Stop Loss payments relating to such Claim(s) or any amounts currently overdue, on a subsequent monthly invoice.

BCBSM, as administrator under this Contract, is subrogated to all rights of the Fund/Enrollees relating to Disputed Claim(s) but is not obligated to institute or become involved in any litigation concerning such Claim(s).

**F.   Fund Audits.**

"The Fund, at its own expense, shall have the right to audit Enrollee claims incurred under this Contract; however, audits will not occur more frequently than once every twelve (12) months and will not include claims from previously audited periods or claims paid prior to the last twenty-four (24) months. Both parties acknowledge that claims with incurred dates over two (2) years old may be more costly to retrieve and that it may not be possible to recover over-payments for these claims; however, BCBSM will use best efforts to retrieve such claims.

All audits will be conducted pursuant to BCBSM corporate policy and other requirements at the time of the audit. The parties acknowledge staffing constraints may exist in servicing concurrent Fund-initiated audits. Therefore after notice from the Fund requesting an audit, BCBSM will have 60 to 90

days, depending on scope and sample size, to begin gathering requested documentation and to schedule the on-site phase of the audit.

Sample sizes will not exceed 200 claims and will be selected to meet standard statistical requirements (i.e., 95% Confidence Level; precision of +/- 3%). The Fund will reimburse BCBSM for claims documentation in excess of 200 claims at $20 per randomly selected claim and $50 per focused or electronically selected claim. However, reimbursement will be waived for any agreed-upon error claims.

Following the on-site activity and prior to disclosing the audit findings to the Fund, the Auditor will meet with BCBSM Management and present the audit findings. BCBSM, depending upon the scope of the audit, will be given a reasonable period of time to respond to the findings and provide additional documentation to the Auditor before the Auditor discloses the audit findings to the Fund.

BCBSM shall have no obligation to make any payments to the Fund unless there has been a recovery from the provider, Enrollee, or third-party carrier as applicable. No adjustments or refunds shall be made on the basis of the auditor's statistical projections of sampled dollar errors. An audit error will not be assessed if the claim payment is consistent with BCBSM policies and procedures, or consistent with specific provisions contained in this Contract or other written Fund instructions agreed to by BCBSM.

Prior to any audit, the Fund and BCBSM must mutually agree upon any independent third party auditor that the Fund wishes to perform the audit. Additionally, prior to audit, the Fund and any third party auditor will sign all documents BCBSM believes necessary for the audit which will, at a minimum, provide for: the scope of the audit; the costs for which BCBSM is to be reimbursed by the Fund; the protection of confidential and proprietary information belonging to BCBSM and of any patient specific information; and the indemnification and hold harmless of BCBSM from any claims, actions, demands or loss, including all expenses and reasonable attorney fees, arising from any suit or other action brought by an individual or provider arising out of any breach by the Fund and/or its auditor.

G.    **Disclosure.**

The Fund will disclose to Participants:  the services being provided by BCBSM; the fact that BCBSM does not insure the  Coverage provided to Enrollees; if BCBSM certificates are used for the purpose of selecting the Coverage(s) to be provided by the Fund, the fact that Enrollees are not covered under these BCBSM certificates and that BCBSM assumes no liability for the Coverage(s) so selected; the party liable for benefits; the party liable for future changes in benefits; the fact that information concerning Enrollees may be reviewed by parties other than BCBSM; and any other matters mandated by law. Also, the Fund will, prior to issuance to Enrollees, submit all Enrollee materials regarding Coverage(s) to BCBSM  for its review and approval and provide BCBSM with copies of the above disclosures.

## H. Statutory and Contractual Interest.

BCBSM's enabling legislation and participating provider contracts may require payment of interest to Enrollees and providers. Any interest required to be paid to Enrollees will be made in addition to and at the time of late payment of a satisfactory claim and to providers pursuant to contract.

The Fund shall reimburse BCBSM for any interest paid if BCBSM did not pay the claim(s) due to: BCBSM's exercise of its contractual right to cease processing claims; the failure of the Fund to timely notify BCBSM of Enrollees' eligibility; or specific instructions from the Fund not to pay claims. BCBSM shall pay any interest otherwise incurred.

## I. Confidentiality.

To the extent permitted by State and Federal law, the Fund may have access to plan records and data and both BCBSM and Fund shall strictly adhere to all such laws regarding confidentiality of data relating to specific Enrollees; and, unless first obtaining the prior written consent of an Enrollee, shall not use any Enrollee's specific data except for claims adjudication and verification purposes as set forth in 1980 PA 350.

The Fund may have access to proprietary information of BCBSM; however, in obtaining such access, the Fund agrees that it will hold all such proprietary information confidential and shall use such information only for purposes related to Enrollees' claims administered by BCBSM pursuant to this Contract and, further agrees, that no such proprietary information shall be released to any third party without such party having first executed an indemnification and confidentiality agreement in a form acceptable to BCBSM. In releasing any proprietary information, BCBSM does not waive any protection it may have regarding trade secrets and other proprietary information pursuant to either the State or Federal Freedom of Information Acts.

Enrollee specific data will not be released to any third party unless a confidentiality and indemnification agreement in favor of, and acceptable to BCBSM has been executed by such third party, which shall limit the use of such data as permitted by State and Federal law.

Nothing in the Contract, however, will prevent the Fund from utilizing overall claims experience and other claims information of a non-specific Enrollee nature for comparative rate quotations.

## J. Medicare Secondary Payer.

The Fund will be responsible for determining whether any person should be covered under this Contract or under the Medicare Program and to identify to BCBSM all persons subject to the Medicare Secondary Payer statute and regulations so that BCBSM may properly pay any Enrollee claim as primary or secondary under the Medicare Program. The Fund agrees to indemnify

and hold harmless BCBSM for any claims, demands, judgments, penalties or other liabilities arising out of the Fund's failure to provide timely and accurate information in order for BCBSM to make any such determination.

### K.  Appeal Procedure.

The Trustees retain the right to hear and decide all appeals in the manner as the Trustees have conducted prior practices. The provisions pertaining to the appeals, as set forth in the Summary Plan Description are hereby incorporated by reference.

### L.  Certification of Creditable Coverage.

Fund_CW_ or BCBSM____, by its initials, agrees to assume all responsibility for issuing automatic certificates of creditable coverage to terminated participants and dependents as required by the Health Insurance Portability and Accountability Act of 1996 and regulations, and further agrees to respond to any requests for such certificates and related inquiries. The Fund will be responsible for notifying BCBSM of all terminations of coverage as set forth in Article II.B. Also, if applicable, the Fund will retain responsibility for issuing certificates of coverage to persons entitled to elect COBRA no later than when the Fund provides the COBRA notice.

# ARTICLE III
# FINANCIAL RESPONSIBILITIES

### A.  General Obligations - Hold Harmless.

The Fund will immediately assume: all risks; all financial obligations, including but not limited to Amounts Billed, court costs, and attorney's fees; and all other liabilities BCBSM may assume or which might otherwise attach with respect to processing Coverage pursuant to this Contract. The Fund will make full payment and satisfaction to BCBSM for all amounts resulting from such risks, financial obligations, and liabilities. If BCBSM, its agents, Participants, officers or directors are made parties to any judicial or administrative proceedings arising out of any function performed by one or more of them under this Contract, the Fund shall indemnify and hold them harmless against all judgments, settlements, including costs and reasonable attorneys' fees if it is necessary for BCBSM to retain outside legal counsel.

Notwithstanding the foregoing, the Fund shall not be responsible for any amount or other liabilities resulting from BCBSM's negligent processing of Enrollees' claims or other negligent or intentional acts of BCBSM, its agents, Participants, officers or directors. BCBSM agrees to indemnify and hold harmless the Fund for any such amount or other liabilities caused or resulting directly from any negligent or intentional acts of BCBSM, its agents, Participants, officers or directors. BCBSM shall also reimburse the Fund for any costs and reasonable attorneys' fees only if the matter is not defended by BCBSM and only if it is necessary for the Fund to retain outside legal counsel.

**B.** **Specific Obligations.**

The Fund will, for each Contract Year, pay BCBSM the total of the following amounts:

(1)    Amounts Billed during the current Contract Year.

(2)    The hospital prepayment reflecting the amount BCBSM determines is necessary for its funding of the prospective hospital reimbursement.

(3)    The actual administrative charge.

(4)    The group conversion fee.

(5)    Any late payment charge.

(6)    Any statutory and/or contractual interest.

(7)    Stop Loss premiums, if applicable.

(8)    Cost containment program fee, if applicable.

(9)    Any other amounts which are the Fund's responsibility pursuant to this Contract, including but not limited to risks, obligations or liabilities, deficit amounts relating to previous agreements, and deficit amounts relating to settlements.

The Provider Network Fee, contingency, and any cost transfer subsidies or surcharges ordered by the State Insurance Commissioner as authorized pursuant to 1980 P.A. 350 will be reflected in the hospital claims cost contained in Amounts Billed.

**C.** **Personal Liability of Trustees.**

It is specifically understood that all sums payable to BCBSM pursuant to this Agreement shall be paid solely from the assets of the Fund, or any Licensee of the Fund and are not the obligation of the Fund Trustees personally, or the (Insert Name) or any of its Locals, District Councils, officers or any employer who contributes to the Fund or any Employer Association or any Delegate.

# ARTICLE IV
# PAYMENT OF FINANCIAL RESPONSIBILITIES

**A.** **Timely Payment and Remedies.**

All amounts owed pursuant to this Contract will be paid timely.  All amounts shown on the Schedule A will be paid by the Fund by the monthly payment day/date.  Any separately invoiced amounts will be paid within fifteen (15)

days of invoice or settlement receipt. BCBSM will pay any amounts due within fifteen (15) days of the settlement.

BCBSM will promptly notify the Fund of any overdue payments. Late payment fees will be assessed as follows:

- If any amount is more than one (1) business day overdue, BCBSM will assess a two (2%) percent late payment fee.

- If any overdue amount remains outstanding into the next month, an additional late payment fee will be assessed for such month and each succeeding month for which such amount remains outstanding.

BCBSM will review the Fund's payments to determine if any late payments are to be assessed. Payments received will first be applied to any amounts overdue. BCBSM may cease processing and paying Enrollees' claims if any payment is ten (10) days overdue retroactive to the last date for which full payment was made.

The payment day, the payment dates and estimated amounts owed for the first Quarterly Payment Period, the statutory and contractual interest rate, and the late payment charge are stated in Schedule A. However, notwithstanding the late payment charge stated, such charge will not exceed the maximum permitted by law.

**B.      Scheduled Payments.**

1.      Schedule A - Initial Term.  The scheduled payments to be paid by the Fund during the Initial Term (first Contract Year) are listed in Schedule A, which shows the following:

(1)      administrative charge per Participant,

(2)      Stop-Loss premiums per Participant, if applicable,

(3)      estimated number of Participants,

(4)      covered lines of business, including those with Stop Loss if applicable,

(5)      the hospital prepayment necessary to maintain the prospective hospital reimbursement funding,

(6)      estimated monthly payments, including Stop Loss premiums if applicable, and

(7)      the schedule and method of payment.

2.      Schedule A - Renewal Term.  Annually, approximately thirty (30) days before the end of each Contract Year, BCBSM will present the Fund with a revised Schedule A.

3. **Estimated Monthly Payments.** During the first two Quarterly Payment Periods, the Fund will, as stated in Schedule A - Initial Term, monthly pay:

(1)     the pro rata cost of estimated Amounts Billed for the Quarterly Payment Period;

(2)     the estimated administrative charge and, if applicable, of Stop Loss premiums for the Contract Year;

(3)     the amount BCBSM determines necessary to maintain the prospective hospital reimbursement funding for the Quarterly Payment Period; and

(4)     any other amounts owed by the Fund pursuant to this Contract.

Thereafter, BCBSM will, approximately thirty (30) days before each Quarterly Payment Period, notify the Fund of any adjustments in the above amounts to be paid during the next Period. The estimated amounts owed relating to claims for each Quarterly Payment Period are based on the total of Amounts Billed during the prior available twelve (12) months, adjusted for costs and utilization.

4. **Claims Listings.** The Amounts Billed for each month are shown on monthly claims listings provided on approximately the twentieth (20th) of each month by line of business as follows:

(1)     Facility claims listings showing charges by claim and in total, and the total Amounts Billed.

(2)     Claims listings for each other line of business showing Amounts Billed by claim and in total.

Each listing will also show any credits for Disputed Claim(s) which have been resolved and any other adjustments.

## C.  Quarterly Settlements.

In conjunction with the payment development for the next Quarterly Payment Period, BCBSM will, approximately sixty (60) days after the close of each Quarterly Payment Period, provide a detailed settlement showing Amounts Billed to and owed by the Fund during the prior available Quarter including any surplus or deficit amounts.

BCBSM will also provide a settlement of the estimated and actual administrative charges based on the actual number of Participants. Any deficit or surplus resulting from this settlement will be reflected in the next Quarterly Payment Period. Stop Loss premiums, if applicable, will be settled in the same manner.

## D.  Changes in Enrollment or Coverages.

In the event of a more than ten (10%) percent change in Enrollment and/or a change in Coverages, the monthly administrative fee, estimated number of Participants and, if applicable, Stop Loss premiums may be revised to reflect such changes in Enrollment and/or Coverages. Any revisions will be effective beginning with the next Quarterly Payment Period following thirty (30) day notification by BCBSM to the Fund.

## E.  Hospital Settlement Adjustments.

Reconciliations of the original and settled hospital reimbursements are made periodically by BCBSM for its participating hospitals. Any hospital settlement adjustments for the Fund will be based upon reconciliations made for those hospitals in which services were received by Enrollees and reflected in Amounts Billed. Depending on whether these reconciliations result in a savings or deficit, BCBSM may make either a credit or charge to a special hospital savings account maintained for the Fund. If for a given calendar year, any cumulative credits and charges made to this account reflect a positive balance, one half of such cumulative balance, net of any applicable Aggregate Stop Loss settlement payments and/or any other amounts owed BCBSM, plus interest will be refunded to the Fund. Only the positive cumulative balance of this special account, if any, will be reflected in any calculations of the Estimated Outstanding Liability (EOL) or in the final settlement for the last Contract Year under Article IV.F. below.

In the event the cumulative balance to this account reflects a negative balance, such balance will not be considered as an amount owed by the Fund; however, any negative balance will be charged interest and netted against any positive facility settlements. Also, if this Contract is terminated and as part of the settlement for the last Contract Year under Article IV.F.3., any provider refunds or settlements due the Fund will be charged first against any such negative balance. Any excess of such refunds or settlements will be credited to the Fund.

## F.  Post Termination.

Notwithstanding anything contained herein to the contrary, the Fund's obligation to pay amounts incurred under this Contract will survive termination, and the Fund will continue to timely pay all amounts owed. Because of the special arrangements and agreements for payment of services between BCBSM and its participating health care providers, all Enrollee claims incurred under this Contract will be processed by BCBSM pursuant to the terms and conditions herein and the Fund agrees that it will have no right to have any such claims processed by a replacement carrier or administrator.

1.  __Monthly Wire Payments.__  For the first three (3) months following termination the Fund will continue to make  monthly wire payments in the same manner as, and as determined before termination; however, if the termination occurs before a settlement has been made for the last Quarterly Payment Period, the Monthly amounts then being made will continue to be made during the first three (3) months following termination unless BCBSM determines a different amount is to be so paid.

In addition, the Fund will, for each  such  first two (2) months only, continue to pay the administrative charge in the same  manner as determined prior to termination.

2.  __Estimated Outstanding Liability.__ Within ninety (90) days following termination, BCBSM will prepare a settlement in the form of a quarterly settlement, for the period from the last quarterly settlement through the date of termination, and  make an initial calculation of the  Estimated Outstanding Liability (EOL), which will  take into account the monthly  payments during the first three (3) months following termination and advise the Fund of its continuing liability for the EOL so estimated.

If the  total amount of the monthly payments made during the first three (3) month period following termination exceed the Amounts Billed during the period, BCBSM will pay the Fund interest  on the average monthly balance of any excess at the then rate for short term government treasury bonds (STIGB).  The total amount of any  excess will be included as gains in the settlement for the last contract year  as provided in Subsection F. 3. below.

3.  __Settlement - Last Contract Year.__  Within ninety (90) days after the first three (3) month period following termination, BCBSM will prepare a total settlement for the last Contract Year and such three (3) month period which will include: if applicable, a final settlement for Stop Loss Premium(s) and Aggregate Stop Loss Attachment Point; a final settlement of administrative fees, except that the settlement for the first two (2) months following termination will be based on the average monthly number of Participants during the last Contract Year; the amount of any gain and losses for Amounts Billed during  the first three (3) months following termination; the hospital prepayment; the positive balance in the hospital savings account, if any, and other credits due the Fund, net of any amounts owed by the Fund; and the amount of any STIGB interest credited to the Fund.  If the summation of the

above shows a loss for the Fund, the Fund shall pay that amount within thirty (30) days net of, if applicable, any surplus as recalculated below and, if not so paid, shall be subject to late payment charges.

The EOL will also be recalculated at this time, which will take into account gains, if any, resulting from the total settlement as determined above. If the recalculation shows a deficit over any funds then held by BCBSM, the Fund will be advised of the amount of the deficit and of its continuing obligation for payment of the EOL. If the recalculation shows a surplus over any funds then held by BCBSM, the amount of the surplus will be refunded to the Fund by BCBSM within thirty (30) days net of, if applicable, any losses resulting from the total settlement as determined above.

BCBSM will first charge any Amounts Billed against any funds then held by it and, after exhausted, will monthly invoice the Fund for Amounts Billed. All monthly invoices will be paid within thirty (30) days of invoice or be subject to late payment charges. BCBSM will continue to pay the Fund STIGB interest on any positive balance as set forth in Subsection F. 2. above.

4.     Interim Calculations and Notifications of EOL.  Within sixty (60) days after each of the six (6) month, twelve (12) month  and eighteen month periods following termination, BCBSM will prepare  settlements for each period, also in the form of quarterly settlements, and make new calculations of the EOL. The purpose of these interim EOL calculations is so that the Fund will be aware of any potential liability for Amounts Billed and plan accordingly.

If any interim calculation  shows  a deficit over any funds then held by BCBSM, the Fund will be so advised of its continuing obligation for payment. If any calculation  shows a surplus over any funds then held by BCBSM, the amount of the surplus will be refunded to the Fund by BCBSM within thirty (30) days. Any Amounts Billed will first be charged against any funds then held by BCBSM and, after exhausted, BCBSM will monthly invoice the Fund for Amounts Billed.

BCBSM will continue to pay the Fund STIGB interest on any positive balance as set forth in Subsection F. 2. above, and any monthly invoices will be subject to late payment charges if not paid within thirty (30) days.

5.     Final Calculation and Notification of EOL.  Within ninety (90) days after the twenty-four month period following termination, BCBSM will prepare a settlement, also in the form of a quarterly settlement, make a final calculation of the EOL and advise the Fund of its continuing liability for payment.  Any funds then held by BCBSM will be returned to the Fund within thirty (30) days.

6.     Subsequent Claims.  Any claims received thereafter  will be billed to the Fund and payable within thirty (30) days of receipt.

G.    **Conversion to Underwritten Fund.**

The provisions of Sections F., 1. through 6., inclusive shall also apply if the Fund converts from a self-funded Fund to a BCBSM underwritten Fund. Any EOL so calculated shall remain the obligation of the Fund, and shall be timely paid as set forth in such Sections in addition to any premium payments as a BCBSM underwritten Fund.


# ARTICLE V
# FUND ACKNOWLEDGMENT OF BCBSM
# <u>SERVICE MARK LICENSEE STATUS</u>


This Contract is between the Fund and BCBSM, an independent corporation licensed by the Blue Cross and Blue Shield  Association (BCBSA) to use the Blue Cross and Blue Shield names and service marks in Michigan.  However, BCBSM is not an agent of BCBSA and, by entering into this Contract, the Fund agrees that it made this Contract based solely only on its relationship with BCBSM or its agents. Fund further agrees that BCBSA is not  a party to, nor has any obligations under this Contract, and that no obligations of BCBSA are created or implied by this language.


# ARTICLE VI
# BLUECARD PROGRAM SERVICES
# <u>PROCESSED AND PAID BY OTHER BCBS PLANS</u>


A.    **Application.**

The BlueCard Program applies only where an Enrollee obtains Out-of-Area Services (other than in Michigan)  from a health care provider that has a participating agreement with another Blue Cross and/or Blue Shield Plan (the "Host Plan") and the Fund is to receive the benefit of the negotiated payment rates and resulting savings for the services provided to the Enrollee.  For these services, the Enrollees' claims will be processed and paid by the Host Plan, which in turn will bill BCBSM for the negotiated rate plus an access fee, if any.

B.    **Access Fees,.**

If an access fee is charged by the Host Plan, the amount of the fee may be up to ten (10) percent of the negotiated savings obtained by the Host Plan from its providers but not to exceed Two Thousand ($2,000) Dollars.  Access fees will be charged only if the Host Plan's arrangements with its participating providers prohibit billing the Enrollee for amounts in excess of the negotiated rate.  However, providers may bill for deductibles and/or copayments.

C.   **Payment of Access Fees.**

If BCBSM is charged an access fee, the amount of the fee will be charged to the Fund as a claims expense  because it represent payments for Enrollee claims which BCBSM was either unable to avoid paying or, in the case of a credit, was able to avoid paying. All access fees paid will be included in Amounts Billed along with the amount paid to the provider.   If BCBSM receives an access fee credit, it will be deducted from Amounts Billed.

D.   **Enrollee Copayments.**

Upon receipt of a claim from the Host Plan under the BlueCard Program, BCBSM will advise the Host Plan of any Enrollee copayment liability. In most instances, BCBSM will calculate this liability based on the lower of the provider's billed charges or the negotiated rate BCBSM pays the Host Plan. This negotiated rate may represent either:

- the actual price paid on the claim, or

- an estimated price which reflects adjusted aggregate payments expected to result from settlements or other non-claims transactions between the Host Plan and all or a specified Fund of its health care providers, or

- a discount from billed charges representing the Host Plan's expected average savings for all or a specified Fund of its health care providers.

Host Plan using the last two methods may prospectively adjust such prices to correct for  over-or underestimation of past prices.

A small number of states, by statute, require Host Plans to use a basis to calculate Enrollee copayments which does not reflect the entire savings to be realized or expected on a particular claim.  If Enrollees receive services in one of these states, their copayment liability will be calculated using these statutory methods.

Enrollees will be advised of the amount of their copayment liability in the Explanation of Benefits Form for the claim.

E.   **Small Claims Applied to Deductibles and/or Copayments.**

If the amount of an Enrollee Claim for Out-of Area Services is either totally or mostly absorbed by deductibles and/or copayments, so that little or no amount will be included in Amounts Billed, and the Host Plan's provider arrangements allows the negotiated payment rate to apply when the amount of the claim is fully or mostly the patient's obligation, BCBSM will pay the Host Plan an access fee, which will be included in Amounts Billed as a claims expense even though little or none of the claim was paid by the Host Plan.

# ARTICLE VII
## AGREEMENT, TERM, TERMINATION,
## AMENDMENT, PERFORMANCE AND VALIDITY OF LAW

A. **Entire Agreement.**

This Contract includes and incorporates any Schedules, Addenda, Exhibits, and Amendments and represents the entire understanding and agreement of the parties regarding matters contained herein, supersedes any prior agreements and understandings, oral or written, between the parties and shall be binding upon the parties, their successors or assigns.

B. **Termination.**

1. <u>Normal.</u> Either party may with or without cause, upon the first (1st) day of the month following thirty (30) days written notice, terminate this Contract as to claims incurred after termination.

2. Nonpayment/Partial Payment. Notwithstanding any other Contract provisions, in the event that the Fund fails to timely pay any amounts owed, BCBSM may, after five (5) days notice, terminate this Contract. Similarly, and notwithstanding any other Contract provision, in the event that BCBSM fails to timely process and pay claims, the Fund may, after five (5) business days written notice, terminate this Contract.

C. **Performance.**

A waiver by any Party of a Default in performance by another party or like waiver by any Party, of any breach or a series of breaches of any of the terms, covenants or conditions of this Contract shall not constitute a waiver of any subsequent breach or a waiver of said terms, covenants or conditions. Resort to any specific remedy not be construed as a waiver of any other rights and remedies to which any Party is entitled under this Contract or otherwise.

D. **Validity.**

Should any part of this Contract for any reason be determined to be invalid or unenforceable, such determination shall not affect the validity or enforceability of any remaining portion, which remaining portion shall remain in full force and effect as if this Contract had been executed with the invalid or unenforceable portion thereof eliminated.

E. **Law and Jurisdiction.**

This Contract is made in the State of Michigan and, unless pre-empted by federal law, will be construed according to the laws of, and jurisdiction of any disputes is vested in the courts of the State of Michigan. BCBSM agrees that it will accept service by registered mail at its address provided under Article VII,

Section G. The Fund will accept service by mail at its address provided under Article VII, Section G.

F.  **Miscellaneous Provisions.**

1.  <u>Assignment.</u>  Neither this Contract, nor any of the services to be performed thereunder, shal1 be assignable or delegable by BCBSM except to the except expressly authorized in writing by the Trustees.

2.  <u>Agency.</u>  Neither the Fund nor the Trustees shall be liable for any act or acts of BCBSM, except those expressly authorized by the terms of this Contract. BCBSM shall not bind or attempt to bind the Fund in any matter. Nothing contained in this Agreement shall be construed as creating the relation of Employer and Employee between the parties, but BCBSM shall at all times be deemed to be an independent contractor.

3.  <u>Legal Counsel.</u>  The Trustees shall designate legal counsel to represent the Fund for any legal action on a claim of benefits against the Fund. The Fund shall defend itself through its legal counsel and BCBSM shall defend itself through its own legal counsel, if both the Fund and BCBSM are joined in the same legal action. BCBSM shall notify the Trustees, and the Fund's legal counsel, immediately upon notice of legal action against the Fund. In the event of such litigation, action or claim, each party shall assume its own duty and cost of defense, and shall pay any claims, damages, awards or settlements, except as provided in Article III. A.

## G.  Notice

Any notice required or permitted to be given hereunder shall be in writing and shall be served upon the other party personally, or by certified mail, postage prepaid, return receipt requested. Any notice to BCBSM shall be addressed to:

Blue Cross Blue Shield of Michigan
Kathy McAttee
1405 Creyts Rd.   B187
Lansing, MI 48917

Any notice to the Fund shall be addressed to the Trustees of the Fund:

Co-Chairperson – Timothy Russell
Co-Chairperson – Bruce Hawley

With a copy to:

Ironworkers Local 340 Fund
510 E. Columbia
Battle Creek, MI 49015

Either party may designate another address at any time by appropriate written notice to the other.

H.    **Authority of Trustees to Execute Contract.**

If this Contract is executed by fewer than all of the Trustees of the Fund, the signatory Trustee(s) warrant(s) and represent(s) that he/they are authorized to enter into this contract on behalf of all Trustees of the Fund and to bind the Trustees and the Fund to the terms hereof.

I.    **Transition of Administrative Services.**

BCBSM shall provide the Fund reasonable assistance in making an orderly transition from BCBSM administration to any future administrator. The Fund shall compensate BCBSM for the cost of any assistance at the termination of this Contract that exceeds what is normally and reasonably provided in accordance with prevailing practice in the industry.

**BCBSM:**

By: _Steven M. Wilk_
       (signature)

Name: _STEVEN M. WILK_
           (print

Title: _RATING ANALYST_

Date: _4-9-03_

By: _Kathy McAttee_
       (signature)

Name: _Kathy McAttee_
           (print)

Title: _Account Executive_

Date: _4/16/03_

**FUND:**

By: _Bruce Hawley_
       (signature)

Name: _BRUCE HAWLEY_
           (print)

Title: _CO-CHAIRMAN_

Date: _5/19/03_

By: _____
       (signature)

Name: _____
           (print)

Title: _____

Date: _____

21